Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

_____ Division

JOY MACK

)
)
)
)
)
)
)
)
)
)
)
)
)
)

*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint.*
*If the names of all the plaintiffs cannot fit in the space above,*
*please write "see attached" in the space and attach an additional*
*page with the full list of names.)*

-v-

CITY OF HOLLYWOOD

*Defendant(s)*
*(Write the full name of each defendant who is being sued. If the*
*names of all the defendants cannot fit in the space above, please*
*write "see attached" in the space and attach an additional page*
*with the full list of names. Do not include addresses here.)*

FILED BY ___ DR ___
Deputy Clerk

**May 11, 2018**

STEVEN M. LARIMORE
CLERK U.S. DISTRICT CT.
S.D. OF FLA. Fort Lauderdale

18-CV-61068-DIMITROULEAS/SNOW

*(to be filled in by the Clerk's Office)*

Jury Trial: *(check one)* ☒ Yes   ☐ No

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

(Non-Prisoner Complaint)

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

UNITED DISTRICT COURT FOR THE DISTRICT
FOR WHATEVER DISTRICT

JOY MACK

CIVIL RIGHTS COMPLAINT
(42 U S C 1983, 1985)
BIVENS

Vs

CITY FORT LAUDERDALE
CITY FT LAUDERDALE POLICE DEPARTMENT
CITY OF HOLLYWOOD
CITY OF HOLLYWOOD POLICE DEPARTMENT
SARGET BARTLETT
OFFICER STABILE
CITY OF MEMPHIS
CITY OF LIGHTHOUSE POINT
HOWARD FORMAN
HOLLYWOOD MEMORIAL HOSPITAL
NOVA UNIVERSITY
DT. JEREMY BELL
UNKNOWN, UNNAMED DOES
BROWARD COUNTY FLORIDA SHERIFFS SCOTT ISREAL
HOUSTON HOSPITAL
HOUSTON COUNTY GEORGIA
CITY OF WARNER ROBINS GEORGIA
UNNAMED NURSE

EXTRA JUDICIAL PUNISHMENT

EMERGENCY TEMPORARY INJUNCTIVE RELIEF
INJUNCTIVE, DECLARTORY RELIEF

UNITED STATES OF AMERICA
DHS
CIA
NSA
FBI
HEALTH HUMAN SERVICES
UNKNOWN, UNNAMED FEDERAL AGENCIES
UNKNOWN, UNNAMED DOES

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

Defendant No. 3
Name                          Sargent Barlett
Job or Title (if known)
Address                       3250 Hollywood Blvd
                              Hollywood          Fl          33021
                                      City        State      Zip Code
County                        Broward
Telephone Number
E-Mail Address (if known)

[X] Individual capacity   [X] Official capacity

Defendant No. 4
Name                          Alfred Stabile
Job or Title (if known)
Address                       3250 Hollywood Blvd
                              Hollywood          Fl          33020
                                      City        State      Zip Code
County                        Broward
Telephone Number
E-Mail Address (if known)

[X] Individual capacity   [X] Official capacity

## II. Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A.   Are you bringing suit against (check all that apply):

     [X] Federal officials (a *Bivens* claim)  Unknown/Unnamed

     [X] State or local officials (a § 1983 claim)  Unknown/Unnamed

B.   Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

Failure to Train   First Second Fourth Fifth Fourteenth Negligence Battery Defamation Return of Property, Retaliation Stigma False Imprisonment Intentional Infliction of Severe Emotional Distress, Plus Spoilation of Evidence Government Intrusion Invasion of Privacy Medical Records

C.   Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

Fourth Fifth   50 USC 1806 (f) Electronic Surveillance FISA NDAA

Page 3 of 6

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

Plaintiff inadvertenly exposed misconduct at the Broward County Courthouse. A Ruse or Scheme that "they" do all the time did not turn out as planned. To Shield misconduct and to keep the public from the knowledge of how they operate; They have placed me in this retaliatory Program.

Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

Plaintiff is Black Listed / Watch Listed in an Unconstitutional Program. Said Program administered via DHS has instituted Cointelpro, Red Squad State Secret Operation (nonconsensual experimentation, technological abuse, PSYOPS Operations) against me.

## III.   Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.   Where did the events giving rise to your claim(s) occur? January 2008 – present Continuems ongoing

B.   What date and approximate time did the events giving rise to your claim(s) occur? May 13, 2014 10:43 am
However the pattern and practice of conduct directed against me is continuelng / ongoing -

C.   What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*
Plaintiff filed action for Injunctive Relief in Southern District of Florida Court. Near 5-12-2014 Plaintiff filed Extension of Time for Brief. On 5-13-2014 in the continued pattern and practice of conduct, Plaintiff experience the same harassment. Plaintiff took pictures & video to document. The persons in the subject vehicle became irate because they did not like Plaintiff taking picture. Plaintiff proceeded on when the subject vehicle came after Plaintiff. (Plaintiff is involved in a Foreclosure Matter / Broward Circuit Court #024095. Plaintiff departed and inadvertenly left her complaint by picking up documents for a Schedule Deposition. Plaintiff will file the correct claim 5-14-2018.

## IV.   Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

9/2010  I was gassed in Columbus Mississippi : My Lungs
Upon Information and belief I may have a sensor
type device in my heart. My heart is enlarged.

5/2016  —  9/2017 Neurological Test are needed
as Plaintiff has awaken to the sounds of crackling in her
Skull — and estimated to be frequencies, radarlocators, Hws etc.
The interference has Kept the doctors from telling Plaintiff. 2/2018 a doctor
at Mid South Plumonary stated that I have COPD. As the pattern of conduct
started; The COPD was Omitted from my medical records to shield the
misconduct.

## V.   Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.

Injunctive Relief :
ORDER - State What Violation of Law Plaintiff has Committed
Remove Plaintiff from this Unconstitutional Program

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:        5-11-2018

Signature of Plaintiff

Printed Name of Plaintiff        Joy Mack

### B.    For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Address        2319 Rodman Street
                Hollywood                FL        33020
                        City            State    Zip Code

Telephone Number

E-mail Address

+               PATTERN AND PRACTICE DIRECTED AGAINST PLAINTIFF

1. **On May 13, 2014   near 10:45am** Plaintiff was traveling in right lane heading west on Pembroke road.   White SUV Chevy Captiva, hereinafter white SUV, approaching switched to left lane then cross over in front of Plaintiff to right lane.   Plaintiff observed Tennessee vehicle plate, immediately slowed to keep distance and switched over to left lane.   The white SUV engaged in a familiar pattern and practice of switching lanes again and Plaintiff switched back to right lane.   As Plaintiff proceeded west, Plaintiff took pictures of white SUV from right lane, passing, continued on west toward State Road 7 / State Road 441 (hereinafter S.R.7/ S.R.441)

2. As Plaintiff was merging into left lanes to make left turn on approached to State Road 441, Plaintiff sensed a quick aggressive surge in motion from the rear of Plaintiff vehicle and was surprised to observe white SUV also move to left behind Plaintiff.   Plaintiff switch to right, subject vehicle switched to right, plaintiff switched to left and then back and forth right, left, and to right, simultaneously the subject vehicle deliberately continued to fish tail behind Plaintiff no matter what direction Plaintiff turned the vehicle wheels.

3. As Plaintiff moved to the left again Plaintiff made total stop in straddle overlapping of two left turning lanes with vehicle front wheels pointed to the left; to let the subject vehicle go in whatever direction.      The white SUV however had made a total stop a little over one car length, (the third lane over); and in a straight six o clock position.  The white SUV did not move. As other vehicles approached the merging lane for the left turn, Plaintiff quickly dialed and redialed 911 and was forced to proceed backwards (near forty five degree angle); out of blocking/impeding the two left lanes.  The subject vehicle

blew horn.   Plaintiff had brief conversation with Dispatcher.   Plaintiff tried to move to the total right of the street - in order to move out of the traffic, into the furthest right lane; and thereby avoiding the S.R.441 intersection of traffic.   However, more traffic continued to approach the area.   Plaintiff called 911 a second time, had brief conversation with Dispatch.

4. Plaintiff was then on the third 911 call to Dispatch when Plaintiff heard the voice of Hollywood Police Department Officer Stabile, (hereinafter HPD, and or Defendant Stabile). Defendant Stabile gave his order to Plaintiff, "I'm here because we got a call that you backed into this vehicle and caused accident."   Plaintiff turned her head toward Defendant Stabile.   Plaintiff then told 911 Dispatcher "The Officer is here."   Defendant Stabile then used his finger to effect his order pointing where; "Get out the car and stand right there" (next to the vehicle gas tank). As Plaintiff, proceeded exiting the vehicle, Officer Stabile ordered Plaintiff using his finger. "Leave your purse inside the vehicle." Plaintiff then left her purse (fanny Pac), inside the vehicle. Without giving Plaintiff a chance to speak, Defendant Stabile walked away.

5. Defendant Stabile then talked to the two subjects, who remained sitting in the white SUV, for near ten minutes. Defendant Stabile then walked back to additional HPD Responders. Plaintiff reached in the car, took out camera and tried to take pictures of vehicles bumper, position, etc.   Defendant Stabile yelled, "Hey, do not take pictures."   "You will be arrested for taking pictures."   Plaintiff ceased taking pictures.

6. Defendant Stabile returned to Plaintiff and again alleged subjects in white SUV alleged Plaintiff hit their vehicle.   Plaintiff stated "I did not hit their vehicle."   "The Hollywood Police Department has people following me and harassing me."   Defendant Stabile

frowned and stated, "The reason they were fishtailing behind you, is because they were looking for an address." Plaintiff stated "No they weren't." Defendant then stated, "They did not know where they were going." Defendant Stabile again quickly turned and walked away from Plaintiff not giving Plaintiff a chance to say more. This lasted less than two minutes.

7. As Defendant Stabile walked away from Plaintiff; both persons exited white SUV and huddled with Defendant Stabile; talking again near twenty minutes. Plaintiff could hear the female subject complain about Plaintiff taking pictures. Plaintiff wanted to go to the huddled group and defend herself but Plaintiff remained by her vehicle because Defendant Stabile gave her a direct verbal order to stand there.

8. Defendant Stabile, and the two SUV subjects came over to Plaintiff and stated; "You caused an accident by hitting their vehicle." Plaintiff responded, "I did not hit the vehicle and pointed to the white SUV. The female subject moved over to the vehicle to inspect. The female subject then squatted down in front of the vehicle. The female subject then moved forward leaning her face close to inspect. The female subject then used her hand for the appearance to wipe dirt. Defendant Stabile loudly raised his voice and stated "You hit that vehicle and anyone that does that is crazy, so I'm taking you to the psyche unit."

9. Defendant Stabile ordered Plaintiff, "Give me your camera, and cell phone, they are evidence." Defendant Stabile placed Plaintiff in handcuffs, confiscated Plaintiffs property and placed Plaintiff in the back seat of his squad car. Defendant Stabile then sat in the driver's seat.

PLAINTIFF OBSERVED THE FOLLOWING

10. Plaintiff could not sit back on the car seat as pain increased with hands behind her back. Plaintiff tried to scoot forward on the car seat. Each time her body slid backwards, Plaintiff continually shifted her torso forward to the front edge of the seat; leaning over in an awkward position to lessen the pain. Plaintiff complained that the handcuffs were too tight and causing pain. Defendant Stabile looked back at Plaintiff; ignored Plaintiff, and started typing his report.

11. Plaintiff's vehicle was visible in front of Defendants Stabile vehicle. Plaintiff personally observed:

Sergeant Brian Bartlett entered Plaintiffs vehicle. While in an upward leaning position, Defendant Bartlett searched Plaintiffs vehicle with the right knee on the driver's car seat, the other leg was extended out the door.   Sargent Bartlett open the middle console, reached down to remove Plaintiffs handgun (Glock 23 SXB643 - .40 cal), from the middle console; backed out the vehicle; place the handgun on the roof of Plaintiffs vehicle;  and reentered the vehicle to continue his search. As this took place, Defendant Stabile turned his head and starred right into Plaintiff face. Defendant Stabile raised his eyebrow, as if to demand a response from Plaintiff.    Plaintiff responded; "I have a Conceal Weapon Permit and my handgun has nothing to do this this incident." Sergeant Bartlett then opened the rear driver's side passenger door of Plaintiffs vehicle, quickly looked inside and closed the rear passenger door.

12. Defendant Stabile exited the squad car, placed Plaintiffs handgun in squad car trunk; reentered with Plaintiffs purse. Plaintiff asked; "Do you have my house keys?"  While raising the keys, Defendant Stabile responded; "Yes I have them."   Plaintiff observed Plaintiff keys and purse on the vehicle car seat next to the Defendant Stabile.   Defendant Stabile took an additional thirty minutes typing his report.

13. Plaintiff complained again about the handcuff causing pain. Defendant Stabile stated, "If you'd be still and don't move they will not tighten on you." "Here you like country music, listen to this." Defendant Stabile then turned up the volume to the country music on the radio.

14. Plaintiff personally observed Defendant Stabile asked Sgt. Bartlett "Have you done one of these?" "Do you know the difference between a Baker Act and Marchmans Act" Sargent Bartlett responded "I don't know, I don't know the difference."

PLAINTIFF WAS TRANSPORTED TO
HOLLYWOOD MEMORIAL HOSPITAL CRISIS UNIT

15. As Plaintiff exited the police vehicle plaintiff personally observe Defendant Stabile collect Plaintiffs keys and purse. In in front of a computer side Hollywood Memorial Hospital Crisis Unit, Plaintiff observed Defendant Stabile remained, in front of a computer in the hospital staff station area nearly an hour searching, and inspecting Plaintiffs purse items. Defendant Stabile still had possession of Plaintiff USB drives. Plaintiff complained x3 to Hospital Staff Nurse Pringle (herein after Nurse Pringle), that Defendant Stabile held Plaintiffs keys and property and Plaintiff wanted property inventoried to ascertain what the officer was taking. Nurse Pringle ignored Plaintiff and shifted Plaintiff into another room where Plaintiff could not observe everything Defendant Stabile was doing to Plaintiffs property.

16. Nurse Pringle proceeded to ask Plaintiff a series of questions related to Plaintiff taking pictures. Nurse Pringle gave facial expression and even repeated the question when Plaintiffs answered the question of Plaintiffs handgun that he did not like. Answering questions about Plaintiffs handgun was very difficult for Plaintiff as Plaintiff knew of the handgun controversy. If Plaintiff chose not to answer questions related to Plaintiffs

handgun, Plaintiff may be forced to stay longer; and, if Plaintiff answered the questions to Plaintiffs handgun, Plaintiff may still be forced to stay longer.

17. Nurse Pringle made a statement about Plaintiffs answer to a question to which Plaintiff defended that Plaintiff had a constitutional right; that Plaintiff has a concealed weapons permit; and that Plaintiffs handgun never was any part of the incident. Near thirty minutes Nurse Pringle left the room.

18. Near 1:30 pm Nurse Pringle allowed access to Plaintiffs cell phone which had been searched by Officer Stabile.   The screen display was changed, from soft blue to fiery red. Plaintiff felt fear, threaten, and intimidation by the red unauthorized color change in Plaintiffs cell phone display.   The color red is used in the Cointelpro/Zersetzen COPS, CERTS, Infraguard  Programs actions directed against Plaintiff in the community; to harass, intimidate, and control Plaintiffs action.

TWO STUDENTS IN TRAINING; AN UNKNOWN NURSE

19. Two female students in training (One Asian, One White American) entered Plaintiffs room and proceeded to ask a series of questions; which included questions about Plaintiff taking pictures and Plaintiff's handgun.  Plaintiff again defended her right to own the handgun.  Plaintiff stated that "My handgun was never a part of the incident and I have a concealed weapons permit."  The two students left the room.

20. Nurse Pringle reentered and then stated that Plaintiff will not be allowed to leave. Plaintiff objected and asked to speak to the Doctor.  Within fifteen minutes Dr. xxxxxxxx entered with the room with two students.  The Asian student appeared indifferent.  The white American female appeared to smirk as if she was amused and delighted by what was going on and by her involvement in Plaintiffs dilemma.

21. Standing at the doorway the doctor asked; "When people are following you, is it one person, one person in different vehicles, or different people in different vehicles?" "Different people in different vehicles" was Plaintiffs reply to which Dr. xxxxxxxx body simultaneously, visibly shook, tremored, his eyes got big and rolled in his head as if he stuck his finger in a socket. Dr. xxxxxx stated, you will have to remain and turned and walked out of the doorway.   The white American student eyes got bigger with a smile on her face.   The Asian student continued to appear indifferent.   The doctor was only in the room less than three minutes.

22. Nurse Pringle then entered with forms.   Plaintiff disagreed with the forms and refused to sign.   This appeared to anger Nurse Pringle.   Nurse Pringle then entered the room with a list of (5 – 7) prescriptions that Plaintiff could not pronounce.   Nurse Pringle alleged the Dr. xxxxxx prescribe for Plaintiff.   Plaintiff rejected to take any medication and told the Nurse Pringle do not provide any medication.   This irritated the nurse even more. Plaintiff again asked about her property.

23. Nurse Pringle gave Plaintiff her purse and inventoried the items.   " Plaintiffs then realized that Plaintiffs house keys were confiscated from Plaintiffs property at the Hospital by Defendant Stabile.

24. Near 5pm Plaintiff was moved to the Hospital Crisis Unit Floor.   Plaintiff asked a nurse," Do you have books that Plaintiff can read to keep busy?"   The nurse eyes got big and in a surprised voice she stated, "I can tell you shouldn't be in here."   "Why are you here?"

25. After 8pm, Plaintiff called HPD Dispatch non-emergency number from the Memorial Hospital Crisis Unit for Plaintiffs house keys.   HPD Dispatcher relayed, Officer Stabile stated that he did not have Plaintiffs Keys; that the keys are in the vehicle.

26. Near 10 pm, Plaintiff was wide awake, in her assigned room, sitting on her bed, reading a book when a nurse that was not assigned to the floor walked in with what was alleged to be another patient.   The nurse offered Plaintiff some cranberry juice.  Plaintiff accepted. The nurse said wait let me go and get some ice.  When the nurse returned; Plaintiff drank the juice.  That's all Plaintiff remembers.  Near 4am according to the clock in the hallway, Plaintiff awoke with the most unusual excruciating headache.  Plaintiffs head felt as if every small vein/nerve ending in her head was on fire.  Plaintiff walked to the nurse station and asked the male nurse for aspirin.  Aspirin was given.

THE NEXT DAY AT MEMORIAL HOSPITAL CRISIS UNIT

27. **May 14, 2014 near** 10am; Plaintiff home voice message from the HPD Dispatcher stated; "Officer Stabile stated your house keys are in the HPD Lobby."

28. Near 1pm; Plaintiffs assigned doctor, Dr. Puscha; Memorial Hospital Psych evaluated/interviewed Plaintiff.  Thereafter Dr. Puscha stated Plaintiff could go home after speaking to the clinical social worker.

29. Near 2:30 pm Nurse Mary Neives entered the dayroom area, slid a paper under Plaintiff nose and in a demanding tone said "Sign this."   After reading the paper, Plaintiff said: "I'm not signing that."  The nurse in a commanding demanding voice said angrily; while shoving an ink pin toward Plaintiffs hand; "You better get with the program or we will keep you longer!"  Plaintiff signed. After Nurse Neives left the room, Plaintiff called the

800# number on the board, (HHS) and reported that Plaintiff was forced to sign something

that Plaintiff did not want to sign.  Plaintiff was given a confirmation number for the report.

30. Plaintiff then went and spoke to the Head Nurse xxxxxx and complained that Plaintiff was

forced to sign a form and Plaintiff asked for the form back.  The head nurse stated that he

will not give it back.  Plaintiff then asked for a copy.  The head nurse refused.  Plaintiff

then asked for a piece of paper and ink pen to file Habeas Corpus.  The head nurse then

asked; "Do you know what Habeas Corpus is?  "You just give us a chance to call the

doctor."  Dr. Pascha returned, and said to Plaintiff; "You will be able to leave."

31. Plaintiff went to speak to the social worker Name Cynthia but Plaintiff was met with

anger and hostility.  The Social Worker Cynthia stated "I will not see anyone who has not

participated in any programs."  Plaintiff was never told that a condition to departure from

Baker Act Involuntary Commitment was participating in programs.  Plaintiff then looked

for scheduled programs; and attended whatever was on scheduled.   The social worker

avoided Plaintiff and kept giving excuse.  The social worker refused to discuss Plaintiffs

discharge/release.

32. Later that night, Plaintiff filed grievance  against Nurse Pringle relating to Plaintiffs

property.

## SUBVERTING PROCESS AND VEHICLE DAMAGE

33. **On May 15, 2015** near 10 am, Plaintiff again tried to speak to the staff social worker

Cynthia.  Staff Social Worker Cynthia avoided Plaintiff.

34. Near 1pm Plaintiff was told that she would have to be interviewed by Intern  Jeremy Bell

(herein after Dr. Bell) in order to be released.  Dr. Bell proceeded to harass, demand,

intimidate, and make rapid fire questions about Plaintiff taking pictures, and about Plaintiff's handgun.

35. Dr. Bell appeared hostile toward Plaintiff having a handgun.  Plaintiff felt the liberty given by Dr. Puscha was now being compromised by this new hostile doctor.  Plaintiff responded to Dr. Bells anger.  "I have a constitutional right to have a handgun.  "I also have a Concealed Weapons Permit."  This appeared to irritate Dr. Bell even more.  The doctor believed the officer.  Dr. Bell stated that the police report written by Defendant Stabile stated Plaintiffs handgun was under the car seat.  Plaintiff stated "That report is false."  "My handgun was not under the car seat."  Even when Plaintiff answered Dr. Bell, Dr. Bell did not believe Plaintiff.  Defendant's Stabile false statement caused Plaintiff fear that she could be forced to stay longer.  Upon additional questioning, Plaintiff had to continually defend having a conceal weapons permit.  Further Plaintiff stated that "I was on the cellphone with 911 Dispatch when the officer approached my car window."  "My handgun was never a part of or a consideration in the incident."

36. Finally, Dr. Bell asked Plaintiff a question; in such a way that Plaintiff considered very peculiar. The question made Plaintiff feel; but for Plaintiffs constitutionally protected activities, Plaintiff was being retaliated against, punished, taught a lesson; by being Baker Acted, Involuntarily Committed; to show her some point or proof.  It was the way Dr. Bell, asked the question; "How do you feel about people who are mentally ill?"

37. Near 4p.m., Nurse xxxxxxxxxxx   returned Plaintiff purse with inventoried items.  " Plaintiff was surprised to find out that Plaintiff's Concealed Weapon Permit; was confiscated from Plaintiffs purse  at the Hospital by Defendant Stabile.

38. Near 5pm, Plaintiff traveled via cab/taxi to retrieve Plaintiff's house keys from the Hollywood Police Department (HPD) lobby; and then rushed to the Superior Towing, 2385 SW 66th Terrace Davie Florida, for Plaintiffs vehicle.   Upon arrival at Superior Towing, Plaintiff was surprised to find / observed a keyed scratch near 42" in length, from the passenger front right panel to and along the passenger rear side door.

39. Plaintiff has personal knowledge that on May 13, 2014 (the day of the incident); that Plaintiffs vehicle did not have the 42" scratch at the time wherein Plaintiff vehicle was confiscated from Plaintiff by Defendants Stabile and Defendant Bartlett.  Plaintiff has been a member of AAA since 2002.   But for Defendant Stabile statement that Plaintiffs vehicle, camera, cell phone were evidence Plaintiff would have had Plaintiffs vehicle towed to her home.

40. The Davie Police Department: Officer xxx xx xxxx observation of the forty two inch scratch and statement; "Scratch was down to bright metal and the paint edges felt rough and fresh. **Exhibit**

### MORE HARASSMENT INTIMIDATION RETAILATION

41. **On May 16, 2014**, near 10:30 am; the very next day after being released from the Memorial Hospital Crisis Unit, Plaintiff was going to her hairdresser.  Plaintiff followed the same path as the day of the incident:  Plaintiff was driving behind a Broward Sherriff Officer vehicle on Pembroke Road; at same location, near same time as the incident which occurred on the 13 May 2014.

42. After making left onto 441-St. Rd 7, Plaintiff followed behind the BSO vehicle.  As both vehicles approached the Miramar Parkway/ State Road 7 intersection; Plaintiff moved over into the right lane as it was vacant.  When the light turned green; Plaintiff and the

BSO vehicle continued to proceed south.  After driving near one half mile; the BSO Officer put on his emergency flashing lights.   To safely move out of traffic; Plaintiff pulled over in the approaching gas station which was near one half mile corner State Road 7 and County Line Road.

43. BSO Officer A. Morales falsely alleged in an angry demanding type voice; "I pulled you over because you were speeding and driving erratically. Plaintiff, can personally attest that Plaintiff had visual contact with the BSO vehicle.  Plaintiff was not speeding nor driving erratically at any time.    Plaintiff became fearful of the BSO Officers falsehood and kept her hands visible on the steering wheel.  Plaintiff was scared of making any statement to dispute Officer Morale's statement, as it might possibly give reason to BSO Officer Morales to place Plaintiff in handcuffs and take Plaintiff away.    Officer Morales allege he was only giving a warning citation #BS 16509 **Exhibit** _____.    Plaintiff was emotionally upset by the BSO stop and departed from the hairdresser without properly getting her hair done. .

## WHAT HAPPENED?

44. **May 23, 2014** While Plaintiff was getting her hair done by hair stylist Dawn Gordon at The Chateau 18379 NW 27 Avenue Miami Gardens Florida 33058.    The hair dresser grasps when she noticed a dark spot, bruise, or hematoma near 1 ½ inches wide by 1 ½ to 2 inches long, at the base of Plaintiffs brain right side. The hair Stylist was alarmed as she cared for Plaintiffs hair once a week. The hairdresser then held two mirrors in a position which would allow Plaintiff to also see the dark spot, bruise or hematoma at the base of Plaintiffs brain.  Plaintiff recalled the Memorial Hospital Crisis Unit; the nurse entered

Plaintiffs room, offered Plaintiff cranberry juice, and loosing conscience thereafter
Exhibit _____

## WHERE ARE PLAINTIFFS 911 (x3) CALLS

**45.** Between May 25, 2014 and September 30, 2014

Plaintiff made several request for the three (x3) audio communication calls made to 911 on May
13, 2014 between 10:50 am and 11:07 am. Initially, the HPD Records Clerk gave Plaintiff a CD
that she alleged had the three calls made by Plaintiff however the CD did not work. Plaintiff went
back to HPD to reorder the CAD and the same clerk asked for Plaintiff to return the first CD.
When Plaintiff returned to pick up the second CD; the CD only had the voice of the caller in the
subject SUV. Plaintiff returned again stating the CD was the wrong CD and the CD of the other
caller. The Clerk wrote out the request again. Thereafter the clerks alleged that HPD did not have
Plaintiffs three (x3) calls to 911 dispatch. Plaintiff then made her complaint to the Records
Supervisor Sheretta Ogden. Ms. Ogden took Plaintiffs request indicating that she would call
Plaintiff when the CD with the three calls is ready.

**46.** Plaintiff then made the request for information on the squad car officer Stabile was driving
on May 13, 2014. The Record Clerk alleged that information was not available to Plaintiff.
Plaintiff then asked to see the training records of Officer Stabile and Officer Bartlett. The
Clerk stated she would have to order that information and call me when it is ready.
Sheritta Ogden called Plaintiff within a reasonable time and alleged that she had the CD
with Plaintiffs three calls (x3), but Plaintiff had to pay two hundred dollars for the
Personnel Records for the Officers Stabile and Officer Bartlett first in order to get the CD.
Plaintiff protested as Plaintiffs request was made before the request for the officer's
training records. Further, Plaintiff did not have the funds. Ms. Sheritta Ogden refused to

give Plaintiff the CD unless Plaintiff paid the $200.00 first.    Ms. Sheritta Ogden refused

Plaintiff as she alleged the request was already made.  In 2017, Plaintiff finally requested

the CD from The Hollywood City Commissioner Peter Hernandez who agreed to pay half

the fee.   The City Manager, and `City Attorney Jeffery Sheffield, did not agree to allow

Plaintiff access to view Defendants Stabile, and Sargent Bartlett's personnel records.

47. Between May 25, 2014   and August 30, 2014, Plaintiff made several request to the BSO

Records Clerk for the audio – CAD Report on the three (x3) calls that Plaintiff made to

911 on May 13, 2014 near 10:40 am.    The response from the clerks ranged from it was

not available or they could not find it.  One clerk tried to whisper through the glass that

Plaintiff could only get it from Hollywood Police Department.  Finally one clerk retrieved

the report and she spent nearly fifteen minutes copying and pasting a report which she

alleged that the only call that exist is the one call from the other caller.

48. Near June 7 & 9, 2014, Plaintiff wrote letter Complaint to Chief of Police Fernandez about

the false statement of HPD Officer Stabile relating to the May 13, 2014 incident.    Exhibit

_____

49. Near June 8, 2014; stolen scandisk, & USB, legal documents from my home.   Exhibit

_____.    After receiving copy of the above report; Plaintiff call officer and stated that

the incident report is wrong in that "Plaintiff never stated she is unsure of what she did with

the items or where she placed them."   Officer refused to correct the report.

50. Near    Room Mates/Tenants - Alleged electrical outage in my home – allegedly wiring

cut or spliced requiring new electrical from inside panel box to outside panel box.

Believed to be state actors  $550

51. Near     Vandalism, damaged to Plaintiffs Plumbing in bathroom.   Toilet & pipes.  (New Faucet was installed near two months previous.)

52. Near June 14, 2014 Plaintiff went into FedEx Kinkos 2501 N Federal Hwy, Boca Raton Fl.  Went back outside within ten minutes.   Someone sprayed something (possibly glue) in Plaintiffs door lock forcing Plaintiff to be without vehicle over nearly a week for repairs. Exhibit _____ $216.69.

53. Plaintiffs arrived home; Computer screen busted – broke.

54. October 16, 2014 Street Theater/Skit Cointelpro tactic: Black Male driving grey charger pulled up in front of my home as I was exiting.  Mixed race female approached along 24 avenue.  Instant dispute between the two; in front of my home corner 24th Avenue/Rodman Street:  Young female kept saying,   "Give me my keys.",   "You have my keys.", "Give me my keys." (This is ridicule pattern of conduct / street theater; of the same statement Plaintiff was making about Defendant Stabile removing Plaintiffs keys)

55. October 21, 2014 White Buick BF following from Ft. Lauderdale Florida / I 95.  I exited Miami Gardens, vehicle followed.  Took pics.  Driver of vehicle became irate.  Moved behind Plaintiffs vehicle and exited the car; 1st confrontation.  Plaintiff drove though intersection two blocks to make left, white Buick follows, exit vehicle second (x2) for confrontation.  Plaintiff called 911.  Exit _____

56. Plaintiff has placed Incident Reports as exhibits.  When the different Police Departments realized that Plaintiff was trying to document the pattern of harassment and retaliation, the officers started refusing to give a report number and or the Records Clerks alleged that they did not have the reports.

**WHAT'S THAT?**

**57.** Near May 5, 2015, **Plaintiff** went to Holy Cross Emergency Rooms for chest pains. After standard protocols were followed by the hospital; a male hospital staff person entered the room stating the lab needed one more tube of blood.   After hospital protocols; Lab work; x rays, the ER Physician reentered the room with an expression on his face as if he had seen a ghost.   Plaintiff knew that the physician would not be forthcoming about what was really on his mind.   The Physician ask Plaintiff:   "Who did you say is your Primary Care Physician?   Plaintiff responded; "I didn't."   "You did not ask."   The next day Plaintiff was at the hospital early before the Medical Records office opened.   Plaintiff retrieved her x-ray CD and medical records from Holy Cross Hospital. Plaintiff observed an odd shaped device; positioned, one on each underside side near the axilla shoulder.    The radiology department at Holy Cross Hospital told Plaintiff to ask her Physician what were the two devices in the x-ray.

**58.** Thereafter:  Plaintiff had difficulty retrieving Plaintiffs Medical Records and or the Medical Records were changed or altered.   The following are the different responses from Plaintiffs doctors.

Near June 2015 Dr Alan Yesner Ft. Lauderdale Florida said the items were artifact; something on Plaintiffs gown.

Near October 2016 Plaintiffs asked the physician assistant in Dr. Ralph Nader's Miami Beach Florida office.  The response:  "It's an artifact" Plaintiff asked what's an artifact. The Physician Assistant response, "An object on your gown."  Plaintiff stated; "But I did not have anything on my gown."  She responded, "Yes, thats what that is."

When Dr. Nader entered the room, Plaintiff then asked Dr. Nader.   Dr. Nader stated "Where is your Heart?"  "All you need to be concerned about is your heart."

Near December 2016 Dr. Andrew Krasner West Palm Beach Florida, ignored the question.   Dr.
Andrew Krasner nurse Debbie said you don't need to be concerned about that.

59. Near July 2017 Plaintiff asked Dr. Schatner Delray Beach Florida.  First he ignored the
question. Plaintiff asked a second time stated, Dr. Schatner  stated "It's not what God
gave you." Plaintiff quickly asked him, "Well what is it?"  Dr. Schatner responded "Ms
Mack, if you keep asking these questions, I am going to have to prescribe you something
for anxiety."   Dr. Schatner statement caused a chilling effect and Plaintiff immediately
cease inquiry

IMMENENT RISK FOR PLAINTIFF AT THE HOSPITAL

60. On or near November 26, 2016 near 1:30 pm at the Houston Memorial Hospital, Warner
Robbins Georgia Plaintiff entered emergency department for heart beats.  After being
checked standard protocols Nurse entered patient's room with male assistant or student.

61. The nurse took patients left arm and without trying to insert the needle she stated "I am
going to have to put the IV in higher (she pointed to upper muscle of arm; bicep);
because I cannot get it in here (pointed to usual areas section areas of arm where blood is
typically drawn.   Nurse inserted IV, taped it securely in place.  Plaintiff  remember
getting up off the table adjusting her  hospital gown with her  right hand to the rear; as
that arm had the blood pressure cuff still in position.

62. As Plaintiff raised off the gurney; the nurse said let me see if I have this on tight.  And all
of the sudden the nurse swung her arm back then immediately thrust it forward and with
strong force grabbed Plaintiffs upper bicep and squeezed it with such force that Plaintiff
instantaneously let out the biggest loudest scream of pain.

63. And then the nurse said a second time "Let me see if I have this on tight."  The nurse
grabbed Plaintiffs arm with such force that Plaintiff screamed in pain.  Plaintiff froze,
was in a daze; trying to overcome the shock of unexpected force and  pain from what just
happened.   The nurse then placed a cup in Plaintiffs left hand and said; "Now go place
urine in this cup."

64. When Plaintiff returned to the room, the blood drawn was still laying on the counter and laid there for no less than forty minutes or more. Exhibit _____ when the patient advocate entered the room; Plaintiff asked her to have someone remove the IV from plaintiffs arm.

65. Later the ER physician discussed the lab results showed unusually high potassium; adding the blood had coagulated from sitting too long.    The doctor wanted to re do the lab.   Plaintiff refused to allow anyone to stick her again.   It was resolved that a different nurse would withdraw only the amount needed using a smaller device from the back of the hand.   Plaintiff placed her complaint with the Patient Advocate and with Nurse Wilson about the incident with the hospital nurse.

66.  Plaintiff tried to make the complaint to the Warner Robins Georgia Police Department. The Police Department staff hung up on Plaintiff  x3.  On Plaintiffs next visit to the Warner Robbins area;   The Warner Robins Police Department Officer Wilner refused to allow plaintiff to make a police report on the incident with the nurse.  Plaintiff experienced stepped up patterns of harassment  in Warner Robbins.  The harassment has placed a chilling effect on Plaintiff as Plaintiff feels that if she called 911 to document the patterns and conduct  of harassment; the police will take Plaintiff away in handcuffs to the jail or the psychiatric facility.

67. Since that time Plaintiff has felt intermittent discomfort in that area of her arm including unusual discomfort deep in the bone.

68. Further Plaintiff is subjected to a  pattern of harassment each visit to the area.

### TO TRUST OR NOT TO TRUST

69. Plaintiff went to Boca Raton Medical Hospital emergency services related to her heart. Patient's fear of harm from the nurse at the Houston Hospital in Warner Robins Georgia, because Plaintiff  to refuse to let the nurses place an IV in her arm to withdraw blood. Plaintiff asked the blood to be withdrawn from hand.  This caused continued back and forth actions with the Boca Community Hospital nursing staff and Plaintiff.

70. After the lab nurse made the withdrawal of blood from the back of Plaintiffs hand, ER Nurse came back into the room and alleged that they needed more blood and to insist that Plaintiff get the IV inserted.  Plaintiff finally agreed for which as the nurse (position on

Plaintiffs left) was making the blood withdrawal, Plaintiff felt something wet sprinkling in her foot.

71. As Plaintiff turned her head to the right and tried to lean around away from the nurse and observed clear like substance rising upward into the air and coming down onto Plaintiffs foot. As Plaintiff started to say what is that?

72. The nurse gave Plaintiff a quick injection of some substance. Plaintiff quickly complained. You injected me with something. The nurse said "I did not." Plaintiff exclaimed. "Yes you did I could tell." The nurse retorted. Well it was Saline. Plaintiff exclaimed No it wasn't. Well it was you blood. Plaintiff complained again but immediately shut up as she knew that she was scared for what unknown substance she was injected.

73. Another nurse came in and said they wanted to keep Plaintiff. The doctor subsequent came in and said they wanted to keep Plaintiff. Plaintiff asked to be released. And was released from the Boca Raton Community Hospital.

74. There has been a series of actions directed against Plaintiff to prevent Plaintiff from refiling her complaint against Former Clerk of Courts Howard Forman. In fact the system of intimidation through the use of PSYOPS is designed to have Plaintiff believe that harm will befall Plaintiffs family by doing so. And in fact, upon information and belief, the recent accidents involving my daughter and Plaintiff are orchestrated to keep Plaintiff silent.

## INTRODUCTIOIN

1. From the late 1980's to 2001 Petitioner was a community activist.

2. Unbeknownst to Petitioner; Petitioner was placed under surveillance because of her activism, in the 1990's.

3. Near 1994 Petitioner entered a citywide election against the then incumbent Hollywood City Commissioner, now Florida State Senator Eleanor Sobel hereinafter Senator E. Sobel.

4. Near 2004, Petitioner created a website of her personal opinion. (Petitioner has chosen not to name the website because of terroristic actions directed against her.)

5. Upon information and belief, a Prosecuting Attorney's Office (near 2014), (Federal and possibly State); was prosecuting an Attorney Anthony M. Livoti Jr. for some type of Viatical Scheme.

6. Upon information and belief, State Attorney Office enjoined alias Phyllis Repole with an Attorney Lawrence Livoti, of Ft. Lauderdale Florida; in a scheme directed against Petitioner.

7. This scheme served no legal purpose, was designed for social and political control, elective office and to punish Petitioner for her views.

8. This scheme was from discriminatory intent.

9. This scheme did not turn out as planned.

10. Near December 2007 Petitioner was in litigation with Phyllis Repole.

11. Near January 3, 2008 Petitioner personally heard Detective Larry Hawkins, Lighthouse Point Police Department state "It's a scheme we do all the time."

12. From January 2008 to the present; Petitioner is the victim of Extra Judicial Punishment: Cointelpro, Red Squad, State Secret Type Operations. Said operations allow those involved to Deny, Deceive, Disrupt, Degrade, Destroy Petitioner, (same as East Germany Stasi); Black List, Watch List, PSYOPS, Non Consensual Experimentation. As a result of the said operations; Petitioner has suffered emotional, physical and financial devastation.

13. Former Clerk H Forman, Court Clerks, Judicial Assistants; The Broward State Attorney Office, Broward Sheriff's Office; unknown, unnamed, agencies, departments, employees,

independent contractors, others , has or are engaging in a pattern and practice to corruptly use the office of Broward County Clerk of Courts to abuse process, cause fear, harass, impede, intimidate, obstruct, punish, and prevent Petitioners access to the court(s), Appellate Courts, and to strip Petitioner of her assets.

14. Said individuals engage in a continued pattern and practice in retaliation for a ruse or scheme that did not go as planned; to shield their misconduct.

15. Said individuals engage in this continued pattern and practice as retaliation for Petitioners speech, and Petitioners past complaint to the Florida Ethics Commission.

16. Said individuals engage in this continued pattern and practice in furtherance of the conspiracy of deprivation of Petitioners rights.

17. Petitioner inadvertently exposed the operation of "Secret Docket Case 0821118". Secret Docket Cases are prohibited by the Florida Supreme Court. Petitioners Foreclosure case is also from the same rogue operation.   And from this exposure Petitioners life is in danger because Petitioner realize the same pattern and practice as related to the 1994 allegations in the Julio Maura case; the deaths of activist Anne Kolb; the death of R. Warren Madoff past Plantation Mayoral Candidate; the timing of the death of Judge Michael Kaplan, and the theft of three Judgeships. (The pattern and practice stated by former Judge Lynn Rosenthal on 595 on her way to work; is the very same pattern and practice that Petitioner experience).

Joy Mack, 2319 Rodman Street, Hollywood, Florida 33020
954-867-8595, joymack39@gmail.com, 14 December 2017
www.onecommonrule.net

STATEMENT OF FACTS

18. Near March 2008, the Philip Repole, Phyllis Repole v. Joy Mack #0821118 case was transferred from County Court to Circuit Court.  At some point Petitioner observed names on the file (one was Gold, Golden or some similar sounding name).  Petitioner asked a Court Clerk who are these names.  The Court Clerk stated that the names are of judges that declined or said no, that they would not take Petitioners case 0821118.  Upon further inquiry the Court Clerk explained:  "When we are trying to get a particular judge, we enter the case into the system."   "If we do not get that judge, we remove the case and reenter it until we get the judge that we want."  Petitioner complained to Clerk H. Forman about this procedure.  Former Judge Ana Gardiner was eventually assigned to the 0821118 case.

19. In 2009, Petitioner arrived home and found one of the Proserve International *v.* Joy Mack court file with all original document filings in Petitioners Home Office file cabinet. (exact case number unknown);

20. Latter in the week, Clerk H. Forman returned the call to Petitioner and stated that Senator Eleanor Sobel submitted Petitioners name for the harassment she is receiving and Senator E. Sobel is the cause of all Petitioners suffering.

21. June 4, 2009, Petitioner filed for a Domestic Violence Restraining Order (DVRO) 09 003919

22. Broward Court Clerk told Petitioner to sign the forms. A white female Court Clerk then gave Petitioner excuses about the availability of the judge.  This Court Clerk told Petitioner that it's better that Petitioner leave the court and return near 2 p.m. When Petitioner returned near 2pm, the Court Clerk gave Petitioner the DVRO forms which had been Denied by Judge Destry without the Petitioner getting a chance to go before the judge.

23. Upon review of the petition; a sentence that Petitioner wrote about "what appeared to be a rifle pointed at me", was somehow missing or removed from the petition. Petitioner later asked Clerk H. Forman to see the original DVRO document. The sentence; "What appears to be a rifle pointed at me." Is also missing from what

appears to be the original petition.

24. It should be noted that as of this writing, the current Broward Circuit Court Docket show that the Judge at that time was the late Judge Michael Kaplan however, Petitioner documents show the Judge was Judge Destry.

25. Near September 3, 2009; Petitioner came to her counsel Attorney Keith Grumer with a Stipulation for Substitution of Counsel however, Attorney Keith Grumer created a big performance,  alleging that Defendant did not give him a chance to resolve the case, so Defendant kept the Stipulation For Substitution of Counsel in her possession and agreed to keep Attorney Grumer as counsel.

26. In February 2010, while reviewing the court file to #0821118; Petitioner was surprise to find a documents/letter entered into the court file near January 10, 2010.  The letter was addressed to Former Circuit Court Judge Ana Gardiner and indicated that the case was now settled.

27. Near May 6, 2010, Petitioner filed a Motion to Compel Attorney Keith Grumer to Provide Defendant with Copy of Alleged Settlement Agreement.  The Court File Docket show the Motion was forwarded to the Judicial Assistant near May 19, 2010. Petitioner never received a scheduled hearing.

28. Petitioner was Juror from June 7 to 10, 2010.  A Court Clerk alleged that Petitioner was a juror in a case and escorted Petitioner to a court room where all the other jurors were already positioned in the chamber seats.  It appeared that everyone in the Court Chambers was awaiting for Petitioners arrival.  There was one seat left open in the juror's box just for Petitioner.  The case was for the capital murder retrial of Inmate Omar Louriero.   The trial did not proceed forward because it appeared that Inmate Omar Louriero fell sick.

29. Near June 8, 2010 Petitioner filed Defendants Motion to Compel Attorney Keith Grumer to Provide Defendant with Copies of Alleged Settlement Agreement mentioned in paragraph 27.

30.  Maria (last name unknown); Judicial Assistant for Former Circuit Court Judge Ana Gardiner scheduled the Hearing for July 25, 2010.  Attorney Grumers Secretary created delays and Judicial Assistant Maria would not give Defendant another date for a hearing; unless Attorney Grumer secretary agreed that he was available.

Petitioner never received a rescheduled hearing on Petitioners Motion.  Thereafter, the #0821118 case was transferred to The Honorable Jack Tuter.

31. Near June 10, 2010, Petitioner was surprised the find the January 10, 2010 Letter addressed to former Judge Ana Gardner now missing from the Court File.  Petitioner complained and faxed a copy of the letter to Clerk H. Forman.  Clerk H. Forman later advised Petitioner that the document was returned to the court file June 25, 2017.

32. Near June 12, 2010 Petitioner went to see attorney in Miami.  Petitioner passed by a white male with a bandana tied around his head sitting on a bus bench.  [Petitioner recognized the white male as the driver of the two door mustang, which pull near the curb of her home near 2am March 31, 2008.  On that night, and a tall white male exited the vehicle.  The door to Petitioners Home Office was unlocked when Petitioners awoke and documents were missing from Petitioners file cabinets.  Police Report made.]

33. Petitioner arrived home from trip to Miami.  An 8x11 paper similar to teletype was positioned on Petitioners dining room table.  Petitioner read the paper, and did not fully understand.  Petitioner read and reread the paper two more times before Petitioner fell to her knees in tears realizing that the paper was about a past event.  Petitioner called and complained to Clerk H. Forman.  Clerk H. Forman later called Petitioner and stated that a rogue group entered Petitioners home and placed the paper on Petitioners dining room table.  Petitioner thought about the white male on the bus bench.

34. Near February 23, 2011, Attorney Keith Grumer filed Motion To Withdraw.

35. Near April 12, 2011, Petitioner filed a Motion In Opposition To Attorney Keith Grumer's Motion To Withdraw.  Petitioners opposing motion had the exhibits of "Stipulation of Substitution of Counsel."  Petitioner also handed a copy of the same motion to Mercedes Pacicifico; Judicial Assistant to Judge Jack Tuter.  Petitioner made three (x3) separate attempts to get a Hearing.  Mercedes Pacifico gave excuses to delay, hinder, refused to schedule a Hearing.  Petitioner never received a notice for a hearing.

36. Thereafter, a Court Clerk, Judicial Assistant or someone with access to the court files and docket removed the exhibit "Stipulation for Substitution of Counsel" from Defendant

Motion In Opposition To Attorney Keith Grumers Motion To Withdraw.   The name of this exhibit was then entered on the Court Docket and dated April 4, 2011. But; the actual document was not physically filed or physically in the court file for the April 4, 2011 date.   Defendant complained to Clerk H. Forman that the document had been removed from Defendants Motion In Opposition To Attorney Keith Grumers Motion To Withdraw.   Later upon inspection, a copy of the "Stipulation For Substitution for Counsel" was now entered in the actual Court File.   However, upon close inspection of this document, it is clear, that the document was signed back on September 3, 2009. Petitioner is personally aware that the "Stipulation for Substitution of Counsel" was in Petitioners possession and was never filed.   The next entry; Motion for Attorneys Keith Grumers Motion to Withdraw is now shown as April 12, 2011 on the Progress Docket Sheet.

37. Near July 29, 2011, Petitioner filed a motion to remove this Falsified Court Document Information.   Petitioner also gave a copy of the motion to Judicial Assistant Mercedes Pacifico.   Petitioner made two attempts to get a hearing scheduled.   Judicial Assistant Mercedes Pacifico delayed hindered, refused to schedule hearing for Petitioner to move the court.   Petitioner never received a scheduled hearing to move the court.   Thereafter the case was transferred to Judge Robert Rosenberg.

38. Near September 2011; in preparation for trial; the style of the case was changed to Joy Mack v. Philip Repole, Phyllis Repole, 0821118. Petitioner got a call from a male who alleged that he was assistant to Judge Robert Rosenberg.   This alleged male assistant stated that Petitioner would be first on the witness stand.   Petitioner complained to Clerk H. Forman.   Clerk H. Forman stated that he ordered his staff to change the case style; and the trial procedure for who gets on the witness stand first back to the way that it should be.

39. Finally Clerk H. Forman told Petitioner to request the Court File from either Supervisors Ryan Stahl or Diana Hollingsworth.   Clerk H. Forman alleged he was ordering the supervisors to keep the file on their desk to keep alterations and modifications from taking place to the file.

Thereafter, Petitioner hired Attorney Richard Rosenbaum to represent her in this Court Case.

40. Near October 2011. Clerk H. Forman contacted Petitioner stated that he wanted to discuss all the complaints Petitioner had about what was happening in the Broward County Court House.

41. During lunch and after repeating the complaints; Clerk H. Forman told Petitioner to stay close to him. Petitioner told Clerk Forman "No, if I did that, the people that are after me will come after you." Clerk H. Forman stated "I am not afraid of anyone, you stay close to me." Petitioner shook her head and stated; "But you are running for office and if I do that they will create problems for you." "Clerk H. Forman hit the table with both hands and said 'I'm not afraid of anyone, now you stay close to me." And so Petitioner stayed close to Clerk H. Forman.

42. Through daily and or weekly conversations with Clerk H. Forman, Petitioner learned the following:

A. That there were court operations used to conduct scheme against Petitioner.

B. That the #0821118 case is/was a type of secret docket case. Secret Docket cases are prohibited *by* the Florida Supreme Court.

C. That Plaintiff (alias) Phyllis Repole #0821118 was placed in Petitioners life in the 1990's by the police to find a way to get, to collect information, to compromise Petitioner; (keep Petitioner from elective office).

D. That Broward County and or some hired source, operates covert vigilante type squads; which controls social and political actions.

That the Cointelpro, Red Squad Type Operations directed against Petitioner are there as a smoke screen. That the real hidden motive to what is happening to Petitioner is

E. That "they" want Petitioner to shut down her website and that "they" weren't going to stop harassing Petitioner until Petitioner shut it down.

F. That Petitioner is Targeted / Watch Listed, in State Secret Type Operations; covert government sponsored program; unwittingly experimented upon (nonconsensual), and Petitioners name was submitted by Senator Eleanor Sobel.

43. From October 2011 to August 2012; Clerk H. Forman did a number of things to make Petitioner think that he was trying to help Petitioner.   But then a series of things started taking place that cause Petitioner to question his role.

44. Petitioner eyeglasses disappeared two separate times; each time Clerk H. Forman  had them.

45. On one occasion Petitioners handbag and keys disappeared from the backseat of Clerk Forman's vehicle and was later placed back.  The same thing happened with Petitioners Cell Phone.

46. Petitioner told Clerk H. Forman that she suspected that her attorney was in collusion with the opposing counsel in the 0821118 cause.  Clerk H. Forman insisted that Petitioner stay with her attorney.

47. When Petitioner started looking for another attorney, Clerk H. Forman would say, "Not him, he's a Republican."

48. If Petitioner did not tell Clerk H. Forman what was discussed, he got angry.

49. Petitioner later found out that her attorney was a defendant in a Federal case in Miami U.S. District Court with Clerk H. Forman's Campaign Associate/Manager Judy Stern.

50. Clerk H. Forman always picked the locations for eating our meals.

51. When Petitioner got information that was favorable and related to the actions that were happening to Petitioner, Petitioner would share this information with Clerk H. Forman and oddly this information would cease or disappear.

52. When Petitioner became convinced that Clerk H. Forman was working with the same people that was causing her harm; Petitioner became frighten and tried to get away from Clerk H. Forman.  Petitioner tried giving excuses.   Clerk H. Forman stated "I can't let that happen." This scared Petitioner even more.

53. At some point Petitioner realized that Clerk H. Forman was taking her back to certain restaurants that they had visited before.

54. Petitioner can think of several restaurants wherein there was something peculiar about the food or within two to twelve hours after dinner with Clerk H. Forman, Petitioner was running to the emergency room.   At that time, Petitioner did not attribute the dinner and emergency room with Clerk H. Forman.

55. Near August 7, 2012 Petitioner and Clerk H. Forman went to dinner at Umberto's

Commercial Boulevard, Ft. Lauderdale Florida.   Petitioner noticed that she could not get her tea sweeten.  It was uniquely bitter.  Petitioner complained and asked if she could taste Clerk H. Forman's tea.  Clerk H. Forman's tea did not taste like Petitioners tea. . Clerk H. Forman then ordered Petitioner a coke.   When Petitioners dinner was served, the lasagna tasted as if it had sand in it.  Petitioner ceased eating the lasagna.   As Clerk H. Forman was driving Petitioner home, Petitioner asked Clerk H. Forman what type of cancer former/past (now deceased) Ft. Lauderdale Commissioner Anne Kolb died from? Clerk H. Forman turned his head very slowly toward towards Petitioner.  His eyes were big with surprise and he remained silent.   Petitioner asked a second time and Clerk H. Forman alleged that he did not know.

56. Once home and asleep, Petitioner mind kept going back to past dinners with Clerk H. Forman.   At some point Petitioners mind kept telling her over and over "Get up" "Get up, go to the emergency room".  The Mt. Sinai Emergency Room lab reports indicated abnormal kidney functions. The hospital did not perform any other tests.

57. Petitioner later saw a nephrologists,

58. Petitioner was first diagnosed with stage IV Kidney Disease, but the doctor later changed this to stage III because he said, "You got me stump."  "You do not have diabetes or high blood pressure."

59. At the second follow up visit and lab report,  the doctor told Petitioner "If you would have continued to have dinner with this person you would be dead."

60. At the third follow up visit and lab report, the nephrologist stated that Petitioners kidneys has stabilized and he then pushed Petitioner to get a Kidney Biospy stating that the recent lab showed the source of infection was in Petitioners kidneys.

61. Petitioner went for a second opinion for which the procedure was not recommended.  So Petitioner did not get the biopsy done.

62. The next time Petitioner visited the nephrologist, he brought up the procedure again as if to insist that it would help Petitioner so Petitioner went forward with the procedure.

63. When Petitioner asked the nephrologist to speak to the detective investigating Petitioners complaint, he said that he would.  However, when he realized the police was involved and was involving Clerk H. Forman, the nephrologist changed all medical records. The Nephrologist placed that Petitioner is Stage II Kidney Disease that Petitioner asked for

the Kidney Biopsy which is totally untrue, and that he told Petitioner that Petitioner did not need the biopsy but that Petitioner insisted on doing it.

64. Further, the Detective with the Ft. Lauderdale Police Department refused to call the doctor and told Petitioner to have the doctor call him.  The Detective alleged that he would not get approval from his boss, or the Chief of Police or higher up in the City.

65. Upon an additional inquiry, the Detective told Petitioner that she had to go for a mental evaluation, (and gave her the name of a certain person to see.); before he, the detective, would investigate futher.  Petitioner objected but went to visit a different counselor found on the internet.  Thereafter, Petitioner went back to the Detective and the Detective refuse any further investigation as he stated City Officials up would never approve investigation of Clerk H. Forman who has thirty eight years of service.

66. Thereafter harassment methods and efforts to tarnish Petitioner mentality and credibility increased.  Petitioner has suffered additional health conditions because of this effort to cause Petitioner harm.

67. Clerk H. Forman took advantage of Petitioners trust in him.   Clerk H. Forman only wanted Petitioner near him to ensure that Petitioner could not, would not say anything bad about the Broward County Courts, Senator Eleanor Sobel, or anyone else involved in what was happening to Petitioner before the election.

68. Clerk H. Forman methodically steered Petitioner to certain restaurant locations wherein certain people was there to place surreptitiously place contaminates, in Petitioners food.

69. The threat of additional harm from the rogue elements which operates on behalf of the Seventeenth Judicial Circuit caused Petitioners fear of turning in this Complaint

CONTINUEING PATTERN AND PRACTICE

70. On or near December 2014 Scott Mulderig, Plaintiff, (provocateur placed in Petitioners life by the police 2004/2005); filed a Foreclosure action against Petitioner (Defendant). Scott Mulderig  v. Joy Mack 14 042095.  This was dismissed

71. Plaintiff filed Amended Complaint January 18, 2016.

72. March 15, 2016 - The Court Denied Defendants Motion To Dismiss….Amended Complaint…. Motion For Final Summary Judgement.   The Case Management Conference was scheduled for April 13, 2016.

73. A pattern between Petitioner and Judicial Assistant (Liz ) was that if Petitioner (Defendant)

did not schedule the Hearing; Liz would not allow Petitioner (Defendant) to reschedule the hearing.     Florida Rule Civil Procedure state:    Only the Court can schedule Case Management Conference.

74. Thursday, April 7, 2016 2:44; Petitioner (Defendant) received an email from noreply@17th.flcourts.org (noreply@17th.flcourts.org) stating

**Court Order:** Order Setting Case Management Conference.

**Document Title:** Case Management Conference

**Status:** Approved - Judge not available - please reschedule for another day.

75. On April 8, 2016 Scott Mulderig (Plaintiff) filed Motion For Default and scheduled hearing for April 20, 2016.

76. On April 13, 2016 Petitioner did not go to the Court. Petitioner relied on email from 17th Judicial Circuit shown in paragraph 74.  Exhibit

77. On April 20, 2016, near 8:15 am Petitioner came to the court for the Motion For Default and filed Motion In Opposition To Motion For Default.

78. On April 20, 2016 near 8:30 am The Daryl Jones Law Firm sent Attorney Fraqua Kahn to represent Petitioner in the Motion For Default.

79. Petitioner observed a male attorney approach Attorney Kahn.  Attorney Kahn looked toward Petitioner and Petitioner sensed the conversation was about Petitioner.

80. Upon hearing the Motion For Default, the Judge (J. Lazarus), was a hostile Judge and granted the Default against Petitioner.

81. Thereafter, and upon inspection of the Court Case Docket, Petitioner observed a Court Order entered on April 13, 2016.   The Order stated   "Case Management Conference" "rescheduled for April 20, 2016" signed by Judger Lazarus.  Opposing Counsels Signature was at the bottom of the Court Order.   Petitioner relied on the 17th Circuit email and was not in attendance.  Petitioner never received a copy of the Court Order.  Exhibit

82. Thereafter the Daryl Jones Law office refuse to file Motion For Reconsideration or Rehearing within the ten days required by the Fl R.C.P. .  Further, Attorney Daryl Jones told Petitioner that their law firm and client would suffer if they represented Petitioner.

83. The seventeenth Judicial Circuit is a hostile Court toward Petitioner.  Petitioner is a victim of asset striping by the pattern and practice used by the 17th Judicial Complex.  Further, Petitioner's and Petitioners life is in danger as Petitioner inadvertently exposed this

common practice.

84. The issue:   Who and why, did Petitioner received the email from the 17th Judicial Circuit on April 7, 2016 alleging that Judge Lazarus was not available and to reschedule?

85. Petitioner observed a Notice on the Board in the area outside of courtroom chambers (old building Room 518)  which did not have the April 13, 2016 date – as a date that the judge would be unavailable.  Exhibit ___

86. Petitioner is not requesting that the Florida Ethic Commission get involved in Petitioners case.  Petitioner is requesting the investigation of an abuse of process wherein said email was sent to Petitioner; and Petitioner relied on said email to her detriment.

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIALCIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CACE14024095

Mulderig, Scott
Plaintiff,

v.

Mack, Joy

Defendants.

## ORDER SETTING CASE MANAGEMENT CONFERENCE

The Court pursuant to Florida Rule of Civil Procedure 1.200(a) after review of the Clerk of Court case maintenance records hereby orders:

1. All parties, individually or through counsel, to appear for a Case Management Conference on **Wednesday, April 13, 2016**              **01:30 PM**        , at the Broward Courthouse, 201 S.E. Sixth Street, **Room   519   **, Fort Lauderdale, Florida 33301. **Mandatory attendance is required for Plaintiff's current counsel of record, including co-counsel; counsel for any party with a pending cross-claim or counterclaim; defense counsel and/or Pro Se Defendants. Corporate parties are reminded that Florida law requires that they be represented by a member of the Florida Bar in good standing.**

2. The Case Management Conference shall be presided over by the undersigned or other judge or general magistrate authorized to hear circuit matters.

3. At the time of the Case Management Conference, the judge or general magistrate shall hear those matters as authorized by Florida Rule of Civil Procedure 1.200(a) **and shall hear all pending motions that shall include any Motion for Summary Judgment properly noticed for hearing**.

4. If a case has been resolved, the parties may avoid the case management conference by forwarding the appropriate paperwork to close the file to the Broward County Courthouse, Courtroom 510, 201 S.E. 6th Street, Fort Lauderdale, Florida, five (5) days prior to the date of the case management conference.

5. If a party fails to appear at the Case Management Conference, the Court may dismiss the action, strike pleadings, limit proof, or take any other appropriate action.

6. It is hereby ordered that Plaintiff's lead counsel shall serve a copy of this order on all parties no less than 20 days prior to the case management conference.

**DONE AND ORDERED** at Fort Lauderdale, Broward County Florida this **15th** day of **March, 2016.**

**CIRCUIT JUDGE**

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Diana Sobel, Room 470, 201 S.E. Sixth Street, Fort Lauderdale, Florida 33301, 954-831-7721 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**